UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CHARLES FREIBERG,                                    CIV. NO. 13-361(MJD/JSM)

       Plaintiff,

v.                                                   <u>REPORT AND RECOMMENDATION</u>

NEXTEL WEST SERVICES LLC,

       Defendant.

The above matter came before the undersigned on defendant's Motion to Dismiss [Docket No. 8]. Steven E. Uhr, Esq. appeared on plaintiff's behalf. Bradley J. Betlach, Esq. appeared on defendant's behalf. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(A), (B) and Local Rule 72.1(c).

## I.    FACTUAL BACKGROUND

### A.    <u>Plaintiffs' Amended Complaint</u>

Plaintiff sued defendant Nextel West Services LLC ("Sprint") in state district court on January 14, 2013. Notice of Removal [Docket No. 1]. Sprint removed the matter to Federal District Court on February 13, 2013. <u>Id.</u> On February 16, 2013, Freiberg filed the First Amended Complaint. <u>See</u> Docket No. 5.

The facts as alleged in the First Amended Complaint are as follows. Plaintiff was employed by Sprint from approximately October, 2004 until his termination on July 30, 2012. <u>See</u> First Amended Complaint [Docket No. 5], ¶ 4. From approximately January, 2012 until his dismissal, plaintiff was a Major Account Manager ("MAM"). <u>Id.</u>, ¶ 6. After his promotion to the MAM position, he was recognized for his high quality of work from

Sprint's vice president of sales.  Id., ¶ 7.  The performance metrics for the MAM position included a sales performance metric and a health metric, but because the MAM position was new in the Twin Cities, MAMs were not to be judged on their sales performance until approximately October, 2012.  Id., ¶ 8.  The metric for ranking employees was not operating correctly through 2012, and plaintiff's performance evaluation did not take into account wire line accounts, which took a significant amount of plaintiff's time.  Id., ¶¶ 9, 10.  Other members of plaintiff's peer group were consistently low on the health metric and the number of monthly sales, yet these individuals were not terminated or otherwise warned that their performance was inadequate.  Id., ¶¶ 11,12.

While Sprint used salesforce.com as a forecasting tool, contrary to Sprint's policy, plaintiff's supervisor, Jason Madison, used a different forecasting tool.  Id., ¶ 13. Plaintiff called his forecasts into Madison in a timely manner and also entered his forecasts into salesforce.com.  Id.  Because of plaintiff's experience in telecommunications, Madison scheduled his weekly "one-on-one" meetings with plaintiff during same time as regularly scheduled training meetings.  Id., ¶ 14.  Other employees in his peer group who did not attend training meetings were not terminated or disciplined for such conduct, and his termination was not consistent with the treatment of other individuals in his peer group.  Id., ¶¶ 15-16.

Between 2008 through 2012, plaintiff made or instigated multiple reports to corporate security or the ethics hotline of wrongdoing by Sprint's employees, including a report regarding the unauthorized misappropriation and sale of hundreds of Sprint phones by least one Sprint's employees, and a report that a number of Sprint's employees, including Madison, planned on attending a vendor junket to the U.S. Open

without obtaining advance company approval as required by Sprint's policy. <u>Id.</u>, ¶¶ 19-21. After one report by plaintiff, Sprint's corporate security employee, Michael Ogden, read plaintiff his "Miranda" rights, which plaintiff believed was done to intimidate and discourage him from making further reports of misconduct by Sprint's employees. <u>Id.</u>, ¶ 22. Madison also told plaintiff after one of his reports that he should not be a "tattle tale." <u>Id.</u>, ¶ 23.

In February, 2012, plaintiff told an employee of Pakistani ancestry, to whom an area sales manager had spoken in a derogatory manner in violation of Sprint's discrimination policy, that the employee should make a report to the Sprint ethics hotline. <u>Id.</u>, ¶ 26. The employee made such a report and subsequently, the area sales manager who made the derogatory comments to the employee, suggested to Madison that plaintiff be terminated. <u>Id.</u>

Plaintiff needed to take time off of work due to litigation against his ex-wife. <u>Id.</u>, ¶ 27. Madison intentionally mislead plaintiff in telling him that his job would not be in jeopardy for the time off he needed to take. <u>Id.</u>, ¶ 27.

In April, 2012, plaintiff received a written warning that his performance was not adequate and he was given a corrective action plan that he fully completed, but Madison told him that the corrective action plan would proceed. <u>Id.</u>, ¶¶ 29, 30. Subsequently, plaintiff exercised his rights under Sprint's "Open Door" policy, but Madison failed to attend the meeting. <u>Id.</u>, ¶¶ 31, 32. The next meeting held between plaintiff and Madison was on July 30, 2012, when plaintiff was terminated. <u>Id.</u>, ¶¶ 32, 39. While plaintiff made another request to invoke Sprint's Open Door policy prior to the termination meeting, Madison did not respond to this request. <u>Id.</u>, ¶ 35. During the

termination meeting, plaintiff again requested to exercise his rights under the Open Door policy, which was denied by Madison. Id., ¶ 38.

Count I asserts a breach of contract on the basis that Sprint retaliated against plaintiff for making reports of wrongful conduct by Sprint's employees in violation of the Sprint's policy prohibiting retaliation against employees who report misconduct or who assist in the reporting of or in the investigation of misconduct. Id., ¶¶ 46-50. According to plaintiff, Sprint's policy against retaliation for reporting misconduct created on enforceable agreement between the parties, and the retaliation against him for making such reports amounted to a material breach of this agreement. Id., ¶¶ 51-54.

Count II alleges that Sprint represented to its employees that their performance would be accurately and consistently measured, as a compared to members of their peer group, through the application of various mathematical formulas, and these representations constituted a binding contractual obligation on Sprint. Id., ¶¶ 56, 57. Plaintiff asserted that during some or all of the time period he was working as a MAM, Sprint did not accurately or properly measure his job performance, which resulted in an incorrect assessment of his past performance and his termination. Id., ¶¶ 58-60.

Count III sets forth another breach of contract claim based on the failure by Sprint to abide with the Open Door policy and instead terminated him, which plaintiff claimed constitutes a material breach of an enforceable agreement between the parties. Id., ¶¶ 62-67.

In Count IV, plaintiff claims that as a consequence of him making good faith reports of wronging by other employees, in violation of state and federal law, Sprint

threatened, disciplined and terminated him in violation of Minn. Stat. § 181.932.  Id., ¶¶ 69-72.

## B.    Additional Evidence Submitted by the Parties

Sprint provided to the Court several excerpts from its Employee Guide in support of the present motion to dismiss.  The first is the "Employment at Will" policy that was allegedly effective on the date of plaintiff's termination.  The policy provided:

> Employment at Sprint is "at will" and for no definite period of time.  Either Sprint or its employees may terminate or alter the terms of employment at any time, with or without advance notice and for any reason or no reason.  Only Sprint's chief executive officer has the authority to enter into any employment contract for any specified or unlimited amount of time or alter an employee's "at will" status.  Such agreement must be in writing and signed by wither the chief executive offer or the chief operating officer and the employee.

Declaration of Valentina "Val" Nosel[1] [Docket No. 12] ("Nosel Del."), Ex. 1.

Sprint also submitted the Code of Conduct in the Employment Guide which provides:

> Demonstrating integrity is one of the core value at Sprint.  Employees who behave in a dishonest, unethical or illegal manner not only reflect poorly on the company but on all of us.   All sprint employees are expected to conduct themselves with the highest level of integrity in all circumstances.  Conduct that is not allowed includes:
>
> * * *
>
> **Retaliation**: Retaliation against any employee who reports or assist in reporting and ethics, discrimination or harassment concern in good faith is prohibited.  Other words that describe retaliation include revenge, pay back and getting even.  At Sprint any form of retaliation or adverse

---

[1]    Valentina "Val" Nosel is employed by Sprint as a Human Resources Manager.  Nosel Del., ¶ 2.

> action against an employee is strictly forbidden. This includes retaliating against en employee who reports in good faith suspected violation of the law, violation of the Sprint Code of Conduct, assisting in an intern; investigation, files an internal/external complaint or files a lawsuit. If an employee believes that they are retaliated against they should report their concerns immediately to any manager, the Ethics Helpline or speak to an HR representative.

Id., Ex. 2. The Code of Conduct also includes the following disclaimer:

> The EPG, sprint policies, guidelines, practices, web pages, handbooks, manuals, programs, plans, video presentations and any other communications are not intended to and do not create a term of employment or employment contract, express or implied, between the employees and Sprint and do not limit or restrict Sprint with respect to the creation or termination of relationships with its employees.

Id.

Finally, Sprint provided the Open Door and Alternate Dispute Resolution Program, which provided in relevant part:

> We're committed to creating a productive work environment that promotes open communication among employees and allows them to seek resolution of job related concerns within the company as quickly, fairly and informally as possible, without retaliation. Employees are encouraged to bring any work-related problems, disagreements, questions, recommendations or comments to the attention of their immediate manager, any other member of management in their functional chain of command, Human Resources or the Ethics Helpline.
>
> The Open Door Process Guide provides tips to assist an employee in preparing for an effective, more formalized Open Door discussion.

Id., Ex. 3. This provision, which was part of Sprint's on-line Employment Guide, also provided the following disclaimer:

> The EPG, sprint policies, guidelines, practices, web pages, handbooks, manuals, programs, plans, video presentations

and any other communications are not intended to and do not create a term of employment or employment contract, express or implied, between the employees and Sprint and do not limit or restrict Sprint with respect to the creation or termination of relationships with its employees.

Id.

In turn, plaintiff, submitted a copy of the Sprint Code of Conduct, which was downloaded from www.sprint.com on March 25, 2013. Relevant portions from the Code of Conduct were as follows:

*Sprint Code of Conduct*

The Sprint Code of Conduct (the Code) is applicable to employees of Sprint and its controlled subsidiaries, the Sprint Board of Directors (Board Members), and anyone we authorize to act on Sprint's behalf. The Code establishes the basic foundation of Sprint's ethics by communicating our philosophy and commitment to all of our employees, customers, other stakeholders and the communities in which we do business. The Code should be used as a resource when questions of legal or ethical appropriateness arise on the job. It is not a comprehensive rulebook, but rather a statement of how Sprint commits to do business. We are bound by the Code and the specific operational policies of Sprint.

\* \* \*

*Retaliation*

Sprint forbids any form of retaliation or adverse action against any employee for reporting in good faith a suspected violation of the law or the Code or for assisting in an investigation. Violators are subject to corrective action up to and including termination.

\* \* \*

The Code cannot explicitly cover all situations or circumstances that an employee may face. It is not a comprehensive, full, or complete explanation of all the laws and regulations that apply to Sprint and its employees. Many of

the issues are discussed in greater detail in other Sprint materials such as the Employee Guide and company policies. All employees have a continuing obligation to familiarize themselves with any applicable laws or company policies; however, nothing can serve as a substitute for good judgment.

Sprint established this Code for company-wide application and any direct conflict between any other policy and the letter or spirit of the Code is to be resolved in favor of the Code.

* * *

### Violations and Consequences

Failure to abide by any laws or policies, including the Code, can compromise the reputation of Sprint and may also result in disciplinary action, up to and including termination of employment. Violations of the Code or illegal acts cannot be justified by saying that they "helped the bottom line," or were directed by a higher authority in the organization. Each employee is responsible for his or her actions. You are never authorized to commit, or direct someone to commit, a violation of the Code or an illegal act. Additionally, you cannot use a contractor, supplier, agent, consultant, broker, distributor or other third party to perform any act prohibited by the Code or the law.

### Raising Issues and Concerns

You are obligated to report violations of the Code, the law or any other company policy or procedure. You may be subject to discipline, up to and including termination, for your failure to do so.

* * *

### Retaliation

Sprint forbids any form of retaliation or adverse action against any employee for reporting in good faith a suspected violation of the law, the Code or for assisting in an investigation. Violators are subject to corrective action up to and including termination.

Affidavit of Steven E. Uhr [Docket No. 17] ("Uhr Aff."), Ex. 1, pp. 1, 2, 17, 18. The conduct addressed in the Sprint Code of Conduct included avoiding conflicts of interest with Sprint, protecting customer privacy, protecting competitive information, protecting company assets from loss or theft, and discrimination. Id., pp. 3-15.

As a part of its reply, Sprint attached the Program Guide: Open Door Process and Alternative Dispute Resolution ("Program Guide") that was produced by plaintiff after Sprint filed the present motion. The Program Guide provided in relevant part:

> Sprint's Open Door process and Alternate Dispute Resolution Program (ADR) work in tandem to support our goal of building productive relationships that allow us to communicate openly, honestly and often. In an effective organization, issues and conflicts are expected and Sprint encourages employees to resolve these issues in a constructive, forward-thinking manner which includes the Open Door Process and, if necessary, the Alternate Dispute Resolution Program.
>
> Most work-related problems are resolved quickly through casual conversations with management. The Open Door Process/ ADR Program is not intended to replace normal communications between employees and supervisors; rather it provides the employee and management a structured process when casual conversation do not adequately address an employee concern.
>
> * * *
>
> *Open Door Process*
>
> Sprint's Open Door philosophy allows employees to seek resolution of job-related concerns within the company as quickly, fairly and informally as possible, without retaliation. When normal conversations have not been successful at resolving an issue, the Open Door Process Guide provides tips to assist an employee in preparing for an effective, more formalized Open Door discussion.

<u>See</u> Affidavit of Bradley J. Betlach [Docket No. 19] ("Betalch Aff."), Ex. 1.

The Program Guide goes on to list the procedures for engaging in the Open Door process, who can participate in the Open Door process, and the recommended timeframe for engaging in the process.  <u>Id.</u>

## II.    STANDARD OF REVIEW

Sprint has moved for dismissal under Rule 12(b)(6).  In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true. <u>Ashley County, Ark. v. Pfizer, Inc.</u>, 552 F.3d 659, 665 (8th Cir. 2009).  In addition, "the court must resolve any ambiguities concerning the sufficiency of the plaintiffs' claims in favor of the plaintiffs, and give the plaintiffs the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint."  <u>Ossman v. Diana Corp.</u>, 825 F. Supp. 870, 880 (D. Minn. 1993) (internal quotation marks and citations omitted).  At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Rule 8 of the Federal Rules of Civil Procedure and meet the principles articulated by the United States Supreme Court in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).  "While legal conclusions can provide the complaint's framework, they must be supported by factual allegations."  <u>Iqbal</u>, 556 U.S. at 664.  A complaint fails to state a cause of action if it does not allege "enough facts to state a claim to relief that is plausible on its face."  <u>Twombly</u>, 550 U.S. at 570.  The pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an unadorned, the-Sprint-unlawfully-harmed-me accusation."  <u>Iqbal</u>, 556 U.S. at 662

(internal quotation marks and citations omitted). The facts supporting a plaintiff's claims must be clearly alleged, as federal courts are not required to "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint." Stone v. Harry, 364 F.3d 912, 915 (8th Cir.2004).

As a general rule, the Court may not consider materials "outside the pleadings" on a motion to dismiss. But this does not mean that only the complaint itself may be reviewed.

> "If, on a motion under Rule 12(b)(6) . . ., matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The court, however, "may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999) (internal citation and punctuation omitted).

Little Gem Life Sciences, LLC v. Orphan Medical, Inc., 537 F.3d 913, 916 (8th Cir. 2008).

With these standards in mind, the Court turns to the Sprint's motion to dismiss.

## III. DISCUSSION

Sprint argued that plaintiff's breach of contract claims fails because he is an at-will employee. See Memorandum of Law in Support of Sprint's Motion to Dismiss Plaintiff's First Amended Complaint [Docket No. 11] ("Def.'s Mem."), p. 9. According to Sprint, plaintiff is an at-will employee because he has failed to allege a written employment agreement between the parties, and its Employee Guide contains a "Employment At Will" provision, setting forth that employment with Sprint "is at-will" and explicitly stating that any agreement changing this provision must be in writing and

signed by the CEO or the COO and the employee.  Id., pp. 9-10, 12-13.  Sprint also argued that no unilateral employment contract exists in this case, as the employee policies at issue are not definite and were not intended to be an offer.  Instead, Sprint claimed that they were merely statements of policy and practice.  Further, Sprint asserted that while plaintiff failed to specifically identify the policy at issue in his First Amended Complaint, to the extent that he is relying on the retaliation provision within the Code of Conduct of the Employment Guide, any such claim fails because this policy also contains an explicit disclaimer disallowing an employment contract based on this provision.  Id., pp. 14-15.

As to Count II, dealing with Sprint's representations to employees that their performance would be accurately and consistently measured and compared with others in their peer group, Sprint argued that plaintiff has not cited to any policy in support of this claim and that the allegations contained as to this count are irreconcilable with his at-will employment.  Id., pp. 16-17.

As for Count III, Sprint maintained that the Open Door and Alternate Dispute Program policy was merely designed to promote open communication among employees, and in the light of the disclaimer, the policy did not create an employment contract.  Id., pp. 17-18.

With regard to plaintiff's Minnesota Whistleblower Act ("MWA") claims alleged in Count IV, Sprint asserted that plaintiff failed to plead sufficient factual content to assert such a claim based on the misappropriation and sale of phones, as he failed to assert to whom the reports were made, the identity of the persons subject to his reports, the precise conduct that he reported, what state and federal laws he believes were violated,

any consequences of his making this specific type of report, or when such personal consequences occurred in relation to the reports.  Id., pp. 22-23.  Moreover, Sprint argued that plaintiff cannot plausibly explain why it would possibly terminate him on the basis of this report, if he saved the company over a million dollars and helped to convict a dishonest employee.  Id., p. 24.  As to plaintiff's MWA claim, based upon his allegation that he encouraged a fellow employee to report a derogatory comment that may have resulted in a hostile work environment, Sprint asserted that this claim fails because plaintiff only alleged that he encouraged another to make a report, as opposed to reporting harassing or discriminatory conduct himself, as required under Minn. Stat. § 181.932.  Id., p. 25.

Plaintiff countered that Sprint's motion to dismiss should be denied or treated as motion for summary judgment because it relied on documents outside of the First Amended Complaint, including Sprint's purported current "Employment At-Will Point Policy;" "Code of Conduct Section of Sprint's Employee Guide," and "Open Door and Alternate Dispute Resolution Program."  See Plaintiff's Response to Defendant's Motion to Dismiss [Docket No. 16], p. 5.  According to plaintiff, these submissions do not set forth the at-will disclaimer that was in effect at the time he was hired; the at-will disclaimer that was in effect at the time plaintiff made his reports of wrongdoing; and the promises, assurances, representations and disclaimers that were in the Open Door grievance policy at the time he was terminated.  Id., pp. 5-6.  In addition, plaintiff claimed that the policies submitted by Sprint cannot be considered because these documents are not referenced or embraced in his First Amended Complaint, including the at-will policy.  Id., p. 6.  While the First Amended Complaint referred to the actual

Code of Conduct and the actual Open-Door policy, plaintiff argued that it did not refer to the "screen-shot" summaries of the policies produced by Sprint, which do not constitute the entire policy. Id., pp. 5-6.

Plaintiff claimed that Sprint was relying on the wrong anti-retaliation policy in support of its motion, and that instead, he was relying on Sprint's actual Code of Conduct that can be found on its public web site, which specifically bound Sprint to not retaliate against any employee for reporting in good faith a suspected violation of the law and superseded any at-will policy. Id., pp. 8-10.

With regard to the breach of contract claim based on Sprint's Open Door policy, plaintiff argued that Sprint has not produced the entire policy as it existed on the date that he attempted to invoke its provisions, which would be necessary to determine how the at-will policy and disclaimer should be interpreted in light of the remainder of the policy. Id., pp. 14-15.

As to the breach of contract claim concerning the measurement of job performance, plaintiff acknowledged that he is not aware of any policy that applied to misapplying performance metrics. Id., pp. 16-17. However, plaintiff asserted that he needed discovery to determine whether any policies may support a legal claim. Id., p. 17.

Plaintiff also argued that his MWA claim pertaining to the theft of phones states a viable cause of action. Plaintiff challenged the assertion that the First Amended Complaint must precisely assert what laws may have been broken, especially where he alleged that at least one Sprint employee was criminally prosecuted for his or her involvement in the scheme. Id., pp. 19-20. Plaintiff also argued that his pleading

alleged sufficient retaliatory motive based on an absence of legitimate motive for his firing, which suggests an illegitimate motive, and that he was yelled at by his superior for being a tattle tale; and was given his <u>Miranda</u> rights during an investigation of one of his reports. <u>Id.</u>, p. 20. Plaintiff maintained that his termination and being threatened constituted employment actions cognizable under the statute. <u>Id.</u>, p. 21. Additionally, plaintiff challenged the assertion that his claim should fail because he has not shown a temporal connection between his reports and Sprint's actions because the First Amended Complaint contained other evidence of motive. <u>Id.</u> As to Sprint's implausibility argument, plaintiff claimed that it was plausible that the employees involved in his termination, Madison or Burns, were involved in this illegal conduct or feared that plaintiff would uncover other wrongdoing. <u>Id.</u>, p. 22. Finally, it was plaintiff's position that when he encouraged someone to make a report of discrimination, plaintiff himself was making a report for the purposes of the MWA. <u>Id.</u>, p. 23.

In its reply, Sprint argued plaintiff did not dispute that he was an at-will employee and that its Employment At Will policy forecloses plaintiff's contract claims. <u>See</u> Reply Memorandum in Support of Sprint's Motion to Dismiss Plaintiffs First Amended Complaint [Docket No. 18], pp. 2-3. Sprint noted that any uncertainty as to the applicable policies is due to plaintiff's failure to identify the applicable policies in his pleading. <u>Id.</u>, p. 3. Sprint claimed that plaintiff's assertion that he is now relying on the Sprint Code of Conduct he filed with the Court ignores the Code of Conduct section of its Employee Guide that was in effect at the time of plaintiff's termination, and plaintiff's attempt to rely solely on the Sprint Code of Conduct he filed with the Court is just an attempt to avoid the legal effect of the disclaimer contained in the Employee Guide's

version.  Id., pp. 3-4.  Similarly, Sprint maintained that after plaintiff filed his response, he produced to Sprint a copy of an electronic brochure titled "Program Guide: Open Door Process and Alternative Dispute Resolution," which should not be used to bypass the disclaimer contained in the Employee Guide's version of the Open Door process. Id., p. 4.

According to Sprint, the policies filed with its motion to dismiss were the policies in effect at the time of plaintiff's termination, as set forth by the Val Nosel's Declaration. Id., pp. 4-5.  As to plaintiff's claims that the policies relied on Sprint were merely snapshots, as Nosel asserted in her declaration, the Electronic Employee Guide replaced the Employee handbook in 2010, and therefore these "screen shots": were equivalent sections of the employee handbook, and are entitled to the same legal effect. Id., p. 5.  Sprint also asserted that earlier versions of the policies are immaterial; the First Amended Complaint does not mention any Code of Conduct, but rather a non-retaliation policy; even if plaintiff meant to refer to the Program Guide in his pleading, this does not make the Employee Guide's Open Door policy in effect at the time of termination any less relevant; while the First Amended Complaint does not mention the Employment At Will policy, it informs all other policies and is therefore embraced by the pleading and should be considered on Sprint's motion to dismiss; and because plaintiff's breach of contract claims are based on employee policies, all the relevant policies are embraced by the First Amended Complaint for the purposes of the motion to dismiss. Id., pp. 5-7.

Sprint went on to argue that the Sprint Code of Conduct relied upon by plaintiff does not contain any specific language that would constitute a unilateral offer of

employment and that the document is an "aspirational document that affixes no contractual rights." Id., pp. 8-9. Even if the Sprint Code of Conduct relied upon by plaintiff is specific enough to rise to the level of an offer, Sprint claimed it must be considered in light of the Employment At Will Policy and the Code of Conduct section in the Employment Guide, and not to the exclusion of one over the other as plaintiff has suggested. Id., p. 9. Sprint emphasized that the Employment At Will policy and the disclaimer included in the Code of Conduct section of the Employee Guide conclusively demonstrate that it did not intend to create an enforceable contract that altered plaintiff's status as an at-will employee. Id., pp. 10-11.

As to the unilateral contract based on performance metrics, Sprint emphasized that plaintiff is an at-will employee and that he admits that he needs to conduct discovery to determine what documents in Sprint's possession may contain statements that rise to the level of a unilateral contract. Id., p. 12. Sprint notes that any change to his status as an at-will employee must be in writing. Id. In sum, it is Sprint's position that this claim is so vague and indefinite that it cannot be sustained. Id.

Sprint argued that the effective Open Door Process policy that was part of the Employment Guide was attached as part of its initial motion to dismiss. Id., pp. 12-13. But even if plaintiff was relying on the Program Guide, Sprint contended that it did not create a unilateral contract of employment, but rather it set forth a series of steps that an employee may use in seeking the resolution of job related concerns and it was still subject to the Employment At Will policy and the disclaimer in portion of the Employee Guide that addresses the Open Door policy. Id., pp. 13-14.

With respect to the MWA claim related to the misappropriation of phones by Sprint's employees, Sprint asserted that plaintiff failed to set forth facts regarding the timing of the his report, alleging only that the conduct occurred during the period of 2008-2012, and his response to the motion merely claimed that during the months and years leading up to his termination, he reported the wrongdoing by employees and managers. Id., p. 15. Based on these vague assertions, Sprint contended that there is no temporal nexus between his reports and his termination, considering that based on his pleading, any report may have been made four years prior to his termination. Id. In addition, Sprint argued that plaintiff's allegations suggest that the report occurred years before his termination and given he alleged he was promoted only 6 months before his promotion, this promotion demonstrated that the claim that he was retaliated against based on the cell phone report was implausible. Id. Sprint also pointed out that plaintiff did not allege that anyone involved in the misappropriation of cell phones was involved in his termination. Id., p. 16. While plaintiff alleged that Madison at some point yelled at him for being "tattle tale," and that he was read his Miranda rights as of result of the investigation into one his reports, Sprint argued that plaintiff provided no context for these allegations in terms of when these events occurred as result of the misappropriation of cell phones, as opposed to the report concerning the U.S. Open junket. Id., pp. 16-17. Sprint claimed that even plaintiff acknowledges that "perhaps" Madison or Burns had involvement in the illegal conduct, and that at best, his claim is based on sheer possibility. Id., p. 17.

Finally, Sprint asserted again that encouraging a fellow employee to make a report does not constitute the "report" required for making claim under Minn. Stat. § 181.932. <u>Id.</u>, p. 18.

### A.     <u>Count I: Breach of Contract--Retaliation</u>

Plaintiff's contract claim against Sprint is that Sprint's policy against retaliation for reporting misconduct created an enforceable agreement between the parties, and that the retaliation against him amounted to a material breach of this agreement. <u>See</u> First Amended Complaint, ¶¶ 51, 52. Plaintiff did not specifically reference in or attach to the First Amended Complaint any written document much less the Employment Guide submitted by Sprint (containing the Code of Conduct Section dealing with retaliation or the disclaimer provision), or the Sprint Code of Conduct he submitted with his opposition that he discovered on Sprint's public website. In addition, there was no reference made in the First Amended Complaint to the Employment At-Will policy in the Employment Guide.

Based on the allegations of the First Amended Complaint, this Court cannot conclude as a matter of law that the sole policy "embraced" by the First Amended Complaint was the Employee Guide, as argued by Sprint. In fact, based on the present record before the Court, there is a dispute regarding the applicable policy.

A hiring for an indefinite period of time is generally terminable at will by either the employer or the employee. <u>See</u> <u>Cedarstrand v. Lutheran Brotherhood</u>, 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962); <u>see</u> <u>also</u> <u>Martens v. Minn. Mining & Mfg. Co.</u>, 616 N.W.2d 732, 741 (Minn. 2000) ("In Minnesota employment is generally considered to be at will....") (citations omitted). "However, a promise of employment on particular terms,

in the form of a definite offer and acceptance for valuable consideration, may create a binding unilateral contract modifying at-will employment." <u>Kaiser v. U.S. Transformer, Inc.</u>, No. C8-95-252, 1995 WL 550896 at *1 (Minn. Ct. App. Sept. 19, 1995) (citing <u>Pine River State Bank v. Mettille</u>, 333 N.W.2d 622, 626 (Minn. 1983)). "[A]n employee handbook may constitute terms of an employment contract if (1) the terms are definite in form; (2) the terms are communicated to the employee; (3) the offer is accepted by the employee; and (4) consideration is given." <u>Feges v. Perkins Restaurants, Inc.</u>, 483 N.W.2d 701, 707 (Minn. 1992) (citation omitted). Even if the language of an employee handbook satisfies the four requirements of <u>Feges</u>, "'[a] disclaimer in an employment handbook that clearly expresses an employer's intent to retain the at-will nature of the employment relationship will prevent the formation of a contractual right to continued employment.'" <u>Coursolle v. EMC Ins. Group, Inc.</u>, 794 N.W.2d 652, 659 (Minn. Ct. App. 2011) (quoting <u>Alexandria Hous. & Redev. Auth. v. Rost</u>, 756 N.W.2d 896, 906 (Minn. Ct. App. 2008)).

Sprint maintains that the applicable policies are the Employment At Will and the Code of Conduct provisions in the Employment Guide. The Employment At Will provision states that employment with Sprint is at "'at will' and for no definite period of time", and that only Sprint's CEO has the authority to enter into any employment contract for any specified or unlimited amount of time or alter an employee's "at will" status. Such agreement must be in writing and signed by either the CEO or the COO and the employee. Nosel Del., Ex. 1. The Code of Conduct dealing with retaliation, contains a disclaimer that states the Employment Guide and its policies do "not create a term of employment or employment contract, express or implied. . . ." Nosel Del., Ex. 2;

see also Coursolle, 794 N.W.2d at 659-60 (concluding that a policy provision precluding an employer from retaliating against an employee did not create a unilateral contract where the provision also contained a disclaimer asserting that the policies in the handbook did not constitute a contract) (string citation omitted).

On the other hand, the Sprint Code of Conduct relied upon by plaintiff, which is signed by Sprint's CEO, states that it "is applicable to employees of Sprint," Sprint is "bound by the Code," "forbids any form of retaliation or adverse action against any employee for reporting in good faith a suspected violation of the law," and explicitly states that "any direct conflict between any other policy and the letter or spirit of the Code is to be resolved in favor of the Code." Uhr Aff., Ex. 1. The Court finds that the terms of the Sprint Code of Conduct are definite in form and not "aspirational" as asserted by Sprint. The plain language of the Sprint Code of Conduct states that it is applicable to employees, Sprint is "bound" by these provisions, and to the extent that the provisions of the Employment At Will and the Code of Conduct under the Employment Guide conflict, they are trumped by the Sprint Code of Conduct. In short, even assuming that the policies presented to the Court by the parties were the universe of policies alleged in his First Amended Complaint, at this stage of the case, where no discovery has been conducted, the Court is not willing to conclude as a matter of law that an employee who is required by Sprint to report violations of the law or the Code, can be terminated for not doing so, and is told that "Sprint forbids any form of retaliation or adverse action against an employee for reporting in good faith a suspected violation of the law or the Code," can at the same time, be terminated for making such a report. This finding is particularly mandated at this juncture of the case in the face of language

by Sprint that "[w]e are bound by the Code and the specific operational policies of Sprint" and "any direct conflict between any other policy and the letter or spirit of the Code is to be resolved in favor of the Code." See Uhr Aff., Ex. 1 (Code of Conduct), pp. 1, 2, 17, 18.

Moreover, questions remain regarding whether these policies were communicated to plaintiff[2] and whether the policies relied upon by the parties were effective during the events at issue. While Sprint's human resources manager stated that the Code of Conduct under the Employment Guide was in effect at the date of the termination, even Sprint's own counsel conceded at the hearing that the Sprint Code of Conduct may have also been in existence at the time of his termination, as evidenced by his assertion that there was a link to this document in the Code of Conduct under the Employment Guide.

In sum, for the purpose of the motion to dismiss, the Court cannot determine at this stage of the suit, without any opportunity for discovery, which policies were in effect during the operative events and ultimately govern the conduct of the parties. For all of these reasons, the Court concludes that Sprint's motion to dismiss as it relates to Count I should be denied.

## B. Count II: Breach of Contract--Performance

In Count II, plaintiff alleged that Sprint represented to employees that their performance would be accurately and consistently measured and compared with others

---

[2] Sprint's counsel represented at the hearing that there was a link to the Sprint Code of Conduct relied upon by plaintiff in the Code of Conduct under the Employment Guide.

in their peer group using "various mathematical formulas." <u>See</u> First Amended Complaint, ¶¶ 56, 57.

For an unilateral employment contract to exist: "(1) there must be an offer that is definite in form and communicated to the employee; (2) the employee must accept the offer; and (3) the employee must furnish consideration for the offer." <u>Kleinberg v. Kleinberg Protective Agency, Inc.</u>, No. C9-99-401, 1999 WL 1256436, *2 (Minn. Ct. App. Dec. 28, 1999) (citing <u>Pine River</u>, 333 N.W.2d at 626-27); <u>Kallestad v. Weavewood, Inc.</u>, No. CX-99-679, 1999 WL 1138495, *3 (Minn. Ct. App. Dec. 14, 1999) ("An employment contract will exist if there is a promise of employment on particular terms, definite in form and communicated to the offeree.") (citing same).

The allegations contained in the First Amended Complaint that Sprint asserted that it would measure the employee performance using "various mathematical formulas" is so vague and conclusory that it does not meet the requirements for pleading a claim under <u>Twombly</u> and <u>Iqbal</u>. Further, there are no facts alleged that support the other elements required to make out a unilateral contract. As such, this Court concludes that Sprint's motion to dismiss as it relates Count II of the First Amended Complaint should be granted. This claim should be dismissed without prejudice.

## C. <u>Count III: Breach of Contract--Open Door Policy</u>

With regard to Count III, plaintiff relied repeatedly on Sprint's "Open Door" policy in support of his breach of contract claim. <u>See</u> First Amended Complaint, ¶¶ 31, 32, 34-38, 62, 63, 64. Plaintiff did not attach this policy to the First Amended Complaint. However, as stated previously, Sprint attached to its Reply the "Program Guide: Open Door Process and Alternative Dispute Resolution" provided to it by plaintiff. At the

hearing, plaintiff's counsel represented that this was the policy that plaintiff was relying on in support of Count III. Since plaintiff has conceded that the breach of contract claim in Count III is based on this policy, the Court finds that it is embraced by the First Amended Complaint and can be considered by the Court in conjunction with the motion to dismiss, without the need to convert the motion into a motion for summary judgment.

As a preliminary matter, the Court acknowledges that there is a dispute between the parties as to the applicable policy regarding the Open Door process. However, to the extent that the Program Guide relied upon by plaintiff is part of the Open Door and Alternative Dispute Resolution Program provision of the Sprint's Employee Guide, then the disclaimer provided in this provision nullifies any contractual rights that may be afforded by the Program Guide. See Coursolle, 794 N.W.2d at 659.

Regardless, the Court does not have to address this dispute, given that it concludes that the Program Guide does not constitute an enforceable contract. Here, the basis of plaintiff's breach of contract claim is that Sprint violated the Open Door policy "when it refused to allow Plaintiff to exercise his rights under that policy and subsequently terminated Plaintiff." First Amended Complaint, ¶ 64. According to plaintiff, Sprint breached the contractual rights afforded under the "Open Door" policy by terminating him before affording him the procedures afforded by the policy, as he requested. However, the Program Guide does not afford him the right to a meeting under the "Open Door" policy prior to his termination. The Program Guide provides that the purpose of the Open Door process is to "support our goal of building productive relationships that allow us to communicate openly, honestly and often." Betalch Aff., Ex. 1, p. 2. The policy is meant to provide a "structured process when casual

conversations do not adequately address an employee concern" and its "philosophy encourages employees" to address any job-related concerns to management or human resources. Id. Significantly, the Program Guide states that the Open Door "philosophy allows employees to seek resolution of job-related concerns. . . ." Id., p. 3. Although the policy contains concrete procedures to follow,[3] there is nothing in the procedures set forth in the Program Guide suggesting any right by the employee to have an Open Door meeting prior to his termination or that Sprint is bound to honor an Open Door meeting request prior to terminating an employee. See Lewis v. Equitable Life Assur. Soc. of the U.S., 389 N.W.2d 876, 883 (Minn. 1986) (in determining whether the language in the handbook was definite enough to constitute an offer the court examines whether the language in the handbook "clearly limits the right to freely dismiss employees"). To the contrary, the Program Guide relied upon by plaintiff states that issues regarding termination must are only addressed by "Step III" of the of the process, which deals with Alternative Dispute Resolution ("ADR"), as opposed to the Open Door process. Betalch Aff., Ex. 1, p. 5. There is no allegation in the First Amended Complaint that plaintiff made any request for ADR.

In sum, the Court concludes that the Program Guide relied upon plaintiff in support of Count III does not afford him any contractual right to an Open Door meeting prior to termination. Therefore, as alleged, plaintiff's breach of contract plain under Count III fails to state claim for relief. Count III should be dismissed with prejudice.

---

[3]  See Pine River, 333 N.W.2d at 630 (Minnesota looks to whether the handbook was a mere "general statement of policy" or whether it sets out "definite language. . .for procedures to be followed.").

**D.** **Count IV: Whistleblower Acts Claims**

    **1.** **Report of Misappropriation of Phones**

The relevant section of the MWA states:

> An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>
> (1) the employee, or a person acting on behalf of an employee, in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;

Minn. Stat. § 181.932, subd. 1(1).

To establish a prima facie case of retaliatory discharge under the MWA, plaintiff must show: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." Hubbard v. United Press Intern., 330 N.W.2d 428, 444 (Minn. 1983) (citation omitted). An employee retaliated against for making a report "need not identify the specific law at issue as long as the report implicates a violation of some law or rule adopted pursuant to law." Freeman v. Ace Telephone Ass'n, 404 F. Supp.2d 1127, 1140 (D. Minn. 2005) (citing Gee v. Minnesota State Colleges and Universities, 700 N.W. 2d 548, 556 (Minn. Ct. App. 2005)).

To satisfy the adverse employment action element of the MWA, an employee must show that the employer's conduct resulted in a "material change in the terms or conditions of her employment." Leiendecker v. Asian Women United, 731 N.W.2d 836, 841 (2007) (quoting Lee v. Regents of Univ. of Minn., 672 N.W.2d 366, 374 (Minn. Ct.

App. 2003)).  Even accepting as true the allegations that plaintiff was "Mirandized" by a company investigator or called a "tattle tale" in response to his report of the misappropriation of telephones, (see First Amended Complaint, ¶¶ 21-23), this conduct does not amount to an adverse action for the purposes of the MWA.

Reading the First Amended Complaint in light most favorable to plaintiff, what is left are his allegations that sometime "during the period of 2008 through 2012," he made or instigated multiple reports to corporate security or the ethics hotline of wrongdoing by Sprint employees, including the unauthorized misappropriation and sale of hundreds Sprint phones by least one Sprint employee; he made a report that employees planned to attend a vendor junket to the U.S. Open without company approval during this period;[4] he received a promotion in January, 2012; and he was terminated on July 30, 2012.  See First Amended Complaint, ¶¶ 6, 7, 19-21, 38-40.  The issue is whether these allegations meet the causation requirement under the MWA.

The necessary retaliatory motive needed to prevail on a claim under the Minnesota Whistleblower Act is difficult to prove by direct evidence.  See Krutchen v. Zayo Bandwidth Northeast, LLC, 591 F. Supp.2d 1002, 1015 (D. Minn. 2008).  As such, "an employee may demonstrate a causal connection by circumstantial evidence that justifies an inference of retaliatory motive.  A claimant under the Whistleblower Act may establish an inference of reprisal by showing a close temporal proximity between the statutorily protected activity and the termination."  Id. (citing Cokley v. City of Otsego,

---

[4]     Plaintiff conceded that his report of a violation of company policy related to employees planning to attend a vendor junket to the U.S. Open without company approval, did not implicate state or federal law and therefore cannot be the basis for a claim under the Minnesota Whistleblower Act.  See Pl.'s Mem., p. 19 n.17.  As such, this Court finds that this claim should be dismissed with prejudice.

623 N.W.2d 625, 632-33 (Minn. Ct. App. 2001)) (emphasis added) (marks omitted)).

Here, it is unclear when plaintiff made the report related to the misappropriation of phones. If it was as early as 2008, this would not an amount to a close temporal proximity between the statutorily protected report and his 2012 termination. See, e.g., Pope v. ESA Services, Inc., 406 F.3d 1001, 1010-11 (8th Cir. 2005), abrogated on other grounds by 643 F.3d 1031 (8th Cir. 2011) (finding that a report made in August in 2001 and a subsequent termination in January 2002 was a time period too long to establish causation); McCracken v. Carleton College, Civil No. 11–3480 (MJD/JJK), --- F.Supp.2d ----, 2013 WL 4516333, *11 (D. Minn. 2013 Aug. 26, 2013) ("The Court finds that McCracken cannot demonstrate a causal connection between any alleged protected activity and the adverse employment action. There is no causal connection for Carleton to retaliate against McCracken for the report about Strong as McCracken's alleged report occurred in April 2006, which was five years before McCracken was discharged from Carleton."); Anderson v. Graybar Elec. Co., Inc., Civil No. 09-251 (MJD/FLN), 2010 WL 2545508, *11 (D. Minn. June 18, 2010) ("[T]here was a year and a half between the time Anderson raised the Premier issue and the fraudulent activity was stopped and Anderson's alleged discharge. Regardless of Schroeder's knowledge, this time period is too long to establish causation."). Standing alone, a four-year period between a report and the retaliatory is too long to establish causation.

On the other hand, plaintiff asserted that he was not relying solely on a temporal nexus to establish a retaliatory motive. Consequently, while Sprint's responses to his complaints regarding the misappropriation of the phones (calling him a tattle tale or

reading him his <u>Miranda</u> rights) and the vendor junket may not constitute adverse actions, they may be found to be evidence of a retaliatory motive.

In short, whether or not plaintiff can ultimately garner other evidence to make out a retaliatory motive is an issue for summary judgment. For the purposes of alleging a whistleblower claim, however, plaintiff has sufficiently alleged a retaliatory motive.[5]

For all of these reasons, the Court concludes that Sprint's motion to dismiss as it relates to his report of the misappropriation of phones should be denied.

### 2. Encouraging Another Employee to Make a Report under the Whistleblower Act

Plaintiff alleged that around February, 2012, he was informed by another employee that Burns, an area sales manager, had made derogatory comments regarding that employee's Pakistani origins. <u>See</u> First Amended Complaint, ¶ 26. Plaintiff asserted that he told the employee to file a report with the ethics hotline and that the employee did so. <u>Id.</u> Plaintiff asserted that Burns subsequently became aware of his involvement in encouraging the report, and that Burns retaliated by suggesting to Madison that plaintiff be terminated. <u>Id.</u>

---

[5]     The Court acknowledges that plaintiff alleged that he received a promotion in 2012, which could cut against any claim that he was retaliated against based on reporting the misappropriation of phones, assuming the report was made by plaintiff before the promotion. However, even to the extent that the promotion came after the report, it is still possible that plaintiff could develop evidence that he was terminated for his pattern of making reports, including the reports regarding the phones. While perhaps this is unlikely, that does not render the claim implausible at this juncture. The Court also rejects Sprint's contention that the allegations fail to state a claim for relief because he failed to allege to whom the reports were made, the identity of the persons subject to his reports, and the precise conduct that he reported, as there is no requirement that a MWA claim (not dealing with fraud) be stated with particularity. <u>See</u> Fed. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 9(b).

The MWA prohibits employers from discharging an employee who "reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. §181.932 subd.1(1). Plaintiff's encouragement of another employee to report derogatory comments to an ethics hotline was not a report for the purpose of the MWA. The word "report" is not defined within the MWA, but Minnesota courts have concluded that the term means either "to make or present an often official, formal, or regular account of" or "to relate or tell about; present." Gee, 700 N.W. 2d at 555 (citing Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs, 536 N.W. 2d 20, 23 (Minn. Ct. App. 1995)). The Court may determine as a matter of law that certain conduct does not constitute a report. Rothmeier v. Investment Advisers, Inc., 556 N.W. 2d 590, 593 (Minn. Ct. App. 1996) (citations omitted). Questions and inquiries do not constitute reports for the purpose of the Statute. Gee, 700 N.W. 2d at 555; Lenzen v. Workers Compensation Reinsurance Ass'n, 843 F. Supp.2d. 981, 995 (D. Minn. 2011). Similarly, participation in an investigation does not constitute a report. See Coursolle, 794 N.W. 2d at 657-58 (finding that providing corroborating information to an investigation of another employee's report is not itself a report). A report must be formal or presented "in an essentially official manner." See Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs, 536 N.W. 2d 20, 23 (Minn. App. 1995); But, see, Buytendorp v. Extendicare Health Services, Inc., 498 F.3d 826, 834 (8th Cir. 2007) (finding that "the contours of the formality requirement . . . remain cloudy.").

Plaintiff did not allege that he presented an official, formal, or regular account of the derogatory comments. Gee, 700 N.W. 2d at 555. Plaintiff also did not relate or

present information about the derogatory comments to anyone, as plaintiff only alleges that he spoke to the employee to whom the comments were directed. Id. Even if plaintiff's encouragement were a report, it does not appear to have been presented in a formal or official manner. See Janklow, 536 N.W. 2d at 23. While the contours of the formality requirement may be "cloudy," a mere verbal encouragement does not meet any level of formality. See Buytendorp, 498 F.3d at 834. As such, plaintiff's conduct is not protected for the purpose of the statute.

Moreover, plaintiff did not himself communicate the report to a proper, statutorily enumerated party. In order to constitute protected activity, a report must be made to an employer, government body, or official. Minn. Stat. §181.932 subd.1(1). As stated previously, plaintiff only spoke with the employee to whom the derogatory comments were directed. Plaintiff does not allege that he communicated with any government body or official, nor did he assert that he spoke to anyone acting as his employer.

In sum, the Court concludes that plaintiff's conduct in encouraging another employee's report does not constitute protected activity because it was not a report and because plaintiff did not communicate with any statutorily enumerated party. See Consolle, 794 N.W. 2d at 658 (finding that the mere participation in the investigation of another employee's report is not protected by the MWA). As such, Sprint's motion to dismiss as it relates to this claim should be granted, and the claim should dismissed with prejudice.[6]

---

[6]     Having concluded that plaintiff cannot state a cause of action under the MWA for his encouragement of another employee to report illegal conduct, does not mean that plaintiff is precluded from developing this evidence to support his claim that he was terminated for reporting of the misappropriation of the phones. In other words, to address the retaliatory motive causation issue, it may be that he can establish that

## IV.    RECOMMENDATION

For the reasons set forth above, it is recommended that: Sprints' Motion to Dismiss [Docket No. 8] be **GRANTED** in part and **DENIED** in part as follows:

1.    Defendant's Motion to Dismiss be **DENIED** as to Count I of the First Amended Complaint.

2.    Defendant's Motion to Dismiss be **GRANTED** as to Count II of the First Amended Complaint.  Count II should be dismissed **WITHOUT PREJUDICE**.

3.    Defendant's Motion to Dismiss be **GRANTED** as to Count III of the First Amended Complaint.  Count III should be dismissed **WITH PREJUDICE**.

4.    Defendant's Motion to Dismiss be **DENIED** as to Count IV of the First Amended Complaint relating to plaintiff reporting the misappropriation of defendant's phones.

5.    Defendant's Motion to Dismiss be **GRANTED** as to Count IV of the First Amended Complaint relating to plaintiff's report of a violation of company policy that dealt with employees planning to attend a vendor junket to the U.S. Open without company approval.  This claim should be dismissed **WITH PREJUDICE**.

6.    Defendant's Motion to Dismiss be **GRANTED** as to Count IV of the First Amended Complaint relating to plaintiff encouraging another employee to make a report of suspected illegality.  This claim should be dismissed **WITH PREJUDICE**.

Dated: November 18, 2013

s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

---

Sprint's response to the other employee's complaint was all part of some pattern on the part of Sprint to get rid of plaintiff in response to his complaints protected by the MWA.

**<u>NOTICE</u>**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 2, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing on or before **December 2, 2013**.